**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:    (925) 407-2700
E-Mail: ltfisher@bursor.com
          apersinger@bursor.com

*Co-Lead Interim Class Counsel*

*(additional counsel appears on signature page)*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: 5-HOUR ENERGY MARKETING AND SALES PRACTICES LITIGATION <br><br> THIS DOCUMENT RELATES TO: ALL CASES | Case No. 2:13-ml-02438 PSG (PLAx) <br><br> **CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Ilya Podobedov, Jordan Moussouros, Richard N. James, Cody Soto, Matt Nunez, Donna A. Thompson, Michael R. Casey, David Ellis, Marc A. Adler, William Forrest, Ayanna Nobles, Thomas Guarino, Junior Hermida, and Michael Feiner ("Plaintiffs") bring this action against Innovation Ventures, LLC ("Innovation Ventures"), its wholly owned subsidiary Living Essentials, LLC (collectively with Innovation Ventures, "Living Essentials," or the "Company"), Manoj Bhargava ("Bhargava"), and Bio Clinical Development, Inc. ("Bio Clinical," collectively with Living Essentials and Bhargava, "Defendants") on behalf of themselves and all others similarly situated.  Plaintiffs make the following allegations upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action lawsuit on behalf of purchasers of 5-hour ENERGY® products ("Products"), marketed by Defendants as a healthy dose of long lasting energy that "doesn't jack you up with sugar, caffeine, and herbal supplements."  In reality, 5-hour ENERGY® products do not provide five hours of energy and Defendants admit that the product provides no caloric energy at all.  Any feeling of increased energy or focus can be attributed solely to the product's highly concentrated dose of liquid caffeine.[1]

2.     Defendants promoted their 5-hour ENERGY® products as containing "B-Vitamins for energy" and "amino acids for focus," leading consumers to believe that the product's healthy dose of B-vitamins and amino acids supply the increased energy.  In reality, the jolt of alertness is actually the result of a concentrated dose of more than 200 milligrams of caffeine, ***more than an extra strength caffeine pill.***

---

[1] Caffeine has a noticeable effect on blood pressure.  Research shows that caffeine intake significantly raises both systolic and diastolic blood pressure.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT                1

3.      Moreover, Defendants market 5-hour ENERGY® products as having "No crash later," referring to a drop in energy levels below the "baseline," which consumers of energy drinks often feel when the effects of the beverages wear off.  In fact, Defendants know that 5-hour ENERGY® products do not wear off gradually and that they cause the same "crash" effects associated with less expensive energy drinks.

4.      Defendants utilize misleading marketing practices as a means of promoting a product with ingredients that do not perform as claimed.  Defendants Bhargava and Living Essentials have received several warning letters from the Food and Drug Administration ("FDA") in connection with the advertising of their other three products which utilize similar marketing practices.   Indeed, years before Bhargava and Living Essentials launched 5-hour ENERGY®, the FDA informed them that they could not get away with making prohibited claims incorporated in the name of the product itself.

5.      To support their misleading claims, Defendants tout purported "clinical studies," the results of which are presented to suggest that 5-hour ENERGY® products act as something other than a concentrated caffeine shot.

6.      The consensus of the medical and nutritional community is clear and consistent: The massive dose of vitamins in 5-hour ENERGY® products are merely flushed out of a consumer's system and provide no energy boost whatsoever.  Similarly, the other ingredients in 5-hour ENERGY® do not provide the product with any of its short-term effects.  It is all in the caffeine.

7.      Plaintiffs bring this action against Defendants in their individual capacities for direct involvement in the dissemination of the misleading claims at issue.  In the alternative, this Complaint also asserts alter ego allegations against Defendant Bhargava and his corporation Bio Clinical and seeks to pierce the corporate veil of Living Essentials to reach those defendants.

8.      Plaintiffs assert claims on their own behalf and on behalf of a nationwide class for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, breach of express and implied warranties and fraud.  Plaintiffs also assert claims on behalf of subclasses under California law for violations of the California *Consumers Legal Remedies Act* ("CLRA"), Civil Code §§ 1750, *et seq.*, *Unfair Competition Law* ("UCL"), *Business & Professions Code* §§ 17200 *et seq.*, and *False Advertising Law* ("FAL"), *Business & Professions Code* §§ 17500 *et seq.*, under New York law for violations of that State's *Deceptive Trade Practices Act*, *General Business Law* § 349, *et seq.*, under Pennsylvania law for violation of that State's *Unfair Trade Practices and Consumer Protection Law* ("UTPCPL"), 73 PA. CONS. STAT. §§ 201-2, *et seq.*, under New Mexico law for violation of that State's *Unfair Practices Act* ("NMUPA"), N.M. STAT. ANN. §§ 57-12-2, *et seq.*, under New Jersey law for violation of that State's *Fraud in Sales or Advertising of Merchandise Law*, N.J. CODE ANN. §§ 56:8-1, *et seq.*, and the New Jersey *Truth-in-Consumer Contract, Warranty and Notice Act*, N.J. Stat. Ann. §§ 56:12-14 to 56:12-18; under Missouri law for violation of that State's *Merchandising Practices Act* ("MMPA"), MO. ANN. STAT. §§ 407.020, *et seq.*, under Florida law for violation of that State's *Deceptive and Unfair Trade Practices Act* ("FDUTPA"), FLA. STAT. §§ 501.201, *et seq.*,  and under Illinois law for violation of that State's *Unfair Practices Act*, 805 ILL. COMP. STAT. 505/1, *et seq*.

## **PARTIES**

9.      Plaintiff Ilya Podobedov ("Podobedov") is a citizen of New York who resides in Brooklyn, New York.  On various occasions during the class period, Mr. Podobedov purchased and consumed 5-hour ENERGY® products from retail stores in the States of New York, Nevada and California.  During the class period, he saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for

energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."   Mr. Podobedov did experience a "crash" after using the product.

10.    Plaintiff Jordan Moussouros ("Moussouros") is a citizen of New York who resides in Westchester, New York.   On various occasions during the class period, Moussouros purchased and consumed 5-hour ENERGY® products , including both individual bottles and multipacks of 5-hour ENERGY® in the State of New York, from retailers including CVS and Duane Reed.   Mr. Moussouros paid approximately $3.00 for each 2 ounce bottle and approximately $12.00 and $15.00 for the 4 and 6 multipacks, respectively.  During the class period, he saw or heard numerous advertisements for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.   These advertisements were featured in television, radio and print.   During the class period, he also saw numerous representation on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Moussouros did experience a "crash" after using the product.

11.    Plaintiff Richard N. James ("James") is a citizen of California who resides in Sylmar, California.   On various occasions during the class period, Mr. James purchased and consumed 5-hour ENERGY® products including both individual bottles and multipacks of 5-hour ENERGY® from retail stores in the State of California.   During the class period, he saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products

1  "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus"
2  and was led to believe that 5-hour ENERGY® provided a feeling of increased energy
3  from ingredients other than caffeine. During the class period, he also saw numerous
4  representations on television as well as in stores and on the label for the product
5  claiming that 5-hour ENERGY® would not cause him to "crash." Mr. James did
6  experience a "crash" after using the product.

7       12.    Plaintiff Matt Nunez ("Nunez") is a citizen of California who resides in
8  Orange County, California. During the class period, Mr. Nunez purchased and
9  consumed 5-hour ENERGY® products from retail stores in the States of California,
10 Nevada, and New York. Had he known of the true character and quality of 5-hour
11 ENERGY®, he would not have purchased (or would have paid less for) the product.
12 During the class period, he saw or heard numerous advertisements, including on
13 television, for 5-hour ENERGY® products claiming that the products "beneficial
14 ingredients" include "B-vitamins for energy" and "amino acids for focus" and was
15 led to believe that 5-hour ENERGY® provided a feeling of increased energy from
16 ingredients other than caffeine. During the class period, he also saw numerous
17 representations on television as well as in stores and on the label for the product
18 claiming that 5-hour ENERGY® would not cause him to "crash." Mr. Nunez did
19 experience a "crash" after using the product.

20      13.    Plaintiff Cody Soto ("Soto") is a citizen of California who resides in Los
21 Angeles County, California. During the class period, Mr. Soto purchased and
22 consumed 5-hour ENERGY® products in the State of California. During the class
23 period, he saw or heard numerous advertisements, including on television, for 5-hour
24 ENERGY® products claiming that the products "beneficial ingredients" include "B-
25 vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour
26 ENERGY® provided a feeling of increased energy from ingredients other than
27 caffeine. During the class period, he also saw numerous representations on television

28

1  as well as in stores and on the label for the product claiming that 5-hour ENERGY®
2  would not cause him to "crash."  Mr. Soto did experience a "crash" after using the
3  product.

4       14.     Plaintiff Ayanna Nobles ("Nobles") is a citizen of California who resides
5  in Alameda County, California.  During the class period, Ms. Nobles purchased and
6  consumed 5-hour ENERGY® products, including but not limited to the decaffeinated
7  variety, in the State of California from retailers including 7-Eleven and Walgreens.
8  During the class period, she saw or heard more than 100 advertisements, including on
9  television, for 5-hour ENERGY® products claiming that the products "beneficial
10 ingredients" include "B-vitamins for energy" and "amino acids for focus" and that 5-
11 hour ENERGY® provided a feeling of increased energy from ingredients other than
12 caffeine.   During the class period, she also saw numerous representations on
13 television as well as in stores and on the label for the product claiming that 5-hour
14 ENERGY® would not cause her to "crash."  Ms. Nobles did experience a "crash"
15 after using the product.

16      15.     Plaintiff Thomas R. Guarino ("Guarino") is a citizen of Illinois who
17 currently resides in the County of Madison, Illinois.   Guarino purchased and
18 consumed 5-hour ENERGY® products in the States of Illinois and Missouri from
19 Wal-Mart, Quik-Trip and other various gas stations over a period of 2-3 years.
20 During the class period, he saw or heard numerous advertisements, including on
21 television, for 5-hour ENERGY® products claiming that the products "beneficial
22 ingredients" include "B-vitamins for energy" and "amino acids for focus" and was
23 led to believe that 5-hour ENERGY® provided a feeling of increased energy from
24 ingredients other than caffeine.   During the class period, he also saw numerous
25 representations on television as well as in stores and on the label for the product
26 claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Guarino did
27 experience a "crash" after using the product.

28

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT         6

16.    Plaintiff Donna A. Thompson ("Thompson") is citizen of the Commonwealth of Pennsylvania who currently resides in Armstrong County, Pennsylvania.  During the class period, Ms. Thompson purchased and consumed 5-hour ENERGY® products from retail stores including Walmart in Pennsylvania. During the class period, she saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, she also saw numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause her to "crash."  Ms. Thompson did experience a "crash" after using the product.

17.    Plaintiff Michael R. Casey ("Casey") is citizen of the Commonwealth of Pennsylvania who currently resides in Allegheny County, Pennsylvania.  During the class period, Mr. Casey purchased and consumed 5-hour ENERGY® products in Pennsylvania and Ohio.  During the class period, he saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Casey did experience a "crash" after using the product.

18.    Plaintiff David Ellis ("Ellis") is a citizen of New Mexico and currently resides in Bernalillo County, New Mexico.  For approximately five years until early 2013, Mr. Ellis purchased and consumed 5-hour ENERGY® products in the State of New Mexico from retailers including Albertson's, Ralph's, Wal-Mart, Smith's,

Walgreens, and various gas stations.  During the class period, he saw or heard numerous television advertisements for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Ellis did experience a "crash" after using the product.

19.    Plaintiff Marc A. Adler ("Adler") is a citizen of New Jersey who currently resides in Essex County, Milburn, New Jersey.  On various occasions during the class period, Mr. Adler purchased and consumed 5-hour ENERGY® products, including individual units and 12-pack multi-packs, from convenience stores or retail establishments, including but not limited to 7-Eleven, CVS, and Carchman Pharmacy in the State of New Jersey.  During the class period, he saw or heard numerous advertisements, including on television and radio, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw numerous representations on television and radio as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Adler did experience a "crash" after using the product.

20.    Plaintiff William Forrest ("Forrest") is a citizen of Missouri and resides in St. Louis, Missouri.  Plaintiff last purchased 5-hour ENERGY® manufactured and marketed by Defendants in December 2012.  On various occasions in the last five years, Forrest has purchased and consumed 5-hour ENERGY® products from retail stores in the state of Missouri, including but not limited to a gas station near West

County Mall in St. Louis, Missouri. During the class period, he saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Forrest did experience a "crash" after using the product.

21.    Plaintiff Junior Hermida ("Hermida") is a citizen of Florida and resides in Naples, Callier County, Florida.  On various occasions in the last five years, Hermida has purchased and consumed 5-hour ENERGY® products from retail stores in the state of Florida, including but not limited to Walgreens, CVS, Publix and a purchase on or about January 21, 2013 at a Mobil gas station located at 2341 Immokalee Road, Naples, Collier County, Florida 34110.  During the class period, he saw or heard numerous advertisements, including on television, for 5-hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw or heard numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Hermida did experience a "crash" after using the product.

22.    Plaintiff Michael Feiner ("Feiner") resides in the State of Florida, in Broward County.  He purchased and consumed 5-hour ENERGY® shots between 10 and 15 times including on or about July 27, 2012, at a 7-Eleven gas station located in Fort Lauderdale, Florida, for a purchase price of approximately $3.00.  During the class period, he saw or heard numerous advertisements, including on television, for 5-

hour ENERGY® products claiming that the products "beneficial ingredients" include "B-vitamins for energy" and "amino acids for focus" and was led to believe that 5-hour ENERGY® provided a feeling of increased energy from ingredients other than caffeine.  During the class period, he also saw or heard numerous representations on television as well as in stores and on the label for the product claiming that 5-hour ENERGY® would not cause him to "crash."  Mr. Feiner did experience a "crash" after using the product.

23.   Defendant Innovation Ventures is a Michigan limited liability company with its principal place of business in Farmington Hills, Michigan.  Innovation Ventures, formed in July 2000 by Defendant Bhargava, has sold a number of products including the dietary supplement 5-hour ENERGY® and a line of "hangover prevention" products under the Chaser® brand name alternatively marketed as dietary supplements or homeopathic remedies (the "Chaser Products").[2]  The members of Innovation Ventures are citizens and residents of one of the following states: Michigan, Indiana or California.  At all relevant times, Innovation Ventures has done substantial business in the State of California.

24.   Defendant Living Essentials is a Michigan limited liability company and wholly owned subsidiary of Innovation Ventures founded in 2008 with its principal place of business in Farmington Hills, Michigan.  At all relevant times, Defendant has done substantial business in the State of California.

25.   Defendant Bhargava, a resident of Michigan, is a board member and Chief Executive Officer of Innovation Ventures.  He also owns 79% of Living Essentials (including 30% owned through a closely held company) and is the sole owner of Defendant Bio Clinical.  Defendant Bhargava created Chaser® in 2000, Chaser® for Wine Headaches in 2001, Chaser® Plus in 2004 and 5-hour ENERGY®

---

[2] After this Action was commenced, Defendants discontinued sale of the Chaser Products.

later that year.  Bhargava is the inventor of 5-hour ENERGY® products and assigned the patents for the formulas for the caffeinated and decaffeinated varieties of the product to Bio Clinical.  Defendant Bhargava makes personal appearances throughout the United States including the State of California.

26.     Defendant Bio Clinical Development is a Michigan corporation with its principal place of business in Farmington Hills, Michigan.  Defendant Bhargava is the sole owner of Bio Clinical and its sole employee.  Bio Clinical holds the patent to the formulas for caffeinated and decaffeinated varieties of 5-hour ENERGY® products.

27.     At all relevant times, each of the Defendants were engaged in the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sale, promotion and/or distribution of 5-hour ENERGY® products.  Defendants control a majority of the market for energy shots.  Defendants sell approximately 9 million bottles of 5-Hour ENERGY® per week in the United States, generating annual sales of approximately $1 billion per year.

28.     At all relevant times, Defendant Bhargava has been operating Bio Clinical and Living Essentials as his alter egos or vice versa and as a single business enterprise.

29.     At all relevant times, each Defendant acted in concert with, with the knowledge and approval of and/or as the agent of the other defendants within the course and scope of the agency, regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

31.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all

1    members of the proposed class are in excess of $5,000,000.00, exclusive of interest
2    and costs, and Plaintiffs, as well as most members of the proposed class, are citizens
3    of states different from Defendants.

4        32.    This Court has personal jurisdiction over Defendants because
5    Defendants conduct substantial business in the State of California through Living
6    Essentials, such that they have significant, pervasive and substantial contacts with the
7    State of California.

8        33.    Venue is proper in this Court under 28 U.S.C. § 1391(a) because a
9    substantial part of the events or omissions giving rise to the claim occurred within
10   this District and because the Defendants are subject to personal jurisdiction in this
11   district.

12              **FACTS COMMON TO ALL CAUSES OF ACTION**
13   **False and Misleading Marketing of 5-Hour ENERGY®**

14       34.    In 2004, Defendants launched 5-hour ENERGY®, the first ever "energy
15   shot,"[3] into the highly competitive energy drink market.  5-hour ENERGY® products
16   are 1.93 – 2 ounce "energy shots" marketed as dietary supplements.

17       35.    5-hour ENERGY® products are sold in retail stores across the country
18   for approximately $2.99 per shot (the suggested retail price).  They are also sold in 2,
19   4, 6, 12 and 24-pack multipack versions for approximately $11.99, $14.99 and $25.99
20   respectively.[4]  The Company's website, in addition to numerous retailers, sell only
21   multipacks and will not sell individual bottles of 5-hour ENERGY®.  5-Hour
22   ENERGY® is sold in over 100,000 retail locations in the U.S., including convenience
23   stores.  5-Hour ENERGY is also sold online at www.5hourenergy.com as well as at
24   other online retailers.  Additionally, the Products come in a number of fruit flavors,
25   and regular, extra strength and decaffeinated varieties.

26   _____
     [3]  An "energy shot" is an energy drink concentrated into a two-three ounce bottle.
27   [4]  *See, e.g*., http://www.shop5hourenergy.com/detail/5HR+BERRY+6 (last accessed
28   April 14, 2012).

36.   In 2011 alone, sales of 5-hour ENERGY® products accounted for approximately one billion dollars in net sales.  Their sales accounted for more than 90% of the energy shot market and the Company boasts that it sells more than nine million bottles per week.

37.   To maintain its large market share, Living Essentials spends approximately 25% of its annual gross sales on a massive and ubiquitous marketing and advertising campaign including television and radio commercials, internet websites, print media, event promotion and celebrity endorsements.  This amounted to $120 million in 2010 alone.  The product's success can be attributed to a large extent to the representations in this media campaign.

### *"5 Hours of Energy"*

38.   Defendants' false advertising begins with the product's name:  5-hour ENERGY®.

39.   Defendants' representation in the product name is no less descriptive and explicit than the claim on the bottle when the product was first launched.  The original packaging promised consumers:  "5 hours of energy now."

40.   Defendants later changed the packaging to read "Hours of energy now," but kept the same misleading representation in the product name.

41.   5-hour ENERGY® does not provide consumers with five hours of energy.

42.   It provides no energy at all.  Indeed, in the Company's most recent 30-second television commercials, it admits in a brief, fine print, written disclaimer that 5-hour ENERGY® "does not provide caloric energy."  Nor does it provide any other form of energy.

### ***5-hour ENERGY®'s Claim of "Beneficial Ingredients"***

43.   Defendants claim that the product is effective in creating a "feeling" of increased energy, alertness and focus.  Defendants, however, falsely and misleadingly attribute this effect to the product's "beneficial ingredients," including B-vitamins and amino acids.  The only ingredient that has any effect is the concentrated dose of caffeine, a psychoactive stimulant.[5]

44.   In fact, Dr. Roland Griffiths, a researcher at John Hopkins University who has studied energy drinks, notes simply that products such as 5-Hour Energy are "caffeine delivery systems."

45.   The regular and extra strength varieties of 5-hour ENERGY® are liquid caffeine shots with a liquid multivitamin including mega-doses of certain B-vitamins, amino acids and enzymes.  The product label indicates that a 1.93 oz. bottle of regular strength 5-hour ENERGY® includes large doses of the following B-vitamins: Vitamin B12, Vitamin B6; folic acid (Vitamin B9) and Niacin (Vitamin B3):



Similar megadoses of liquid B-vitamins can be purchased for less than $0.10 per dose.

---

[5]   By stimulating the central nervous system, it causes unevenness in heart rhythms and an increase in heart rate.  (Food and Drug Administration, 2007).

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT                    14

46.     While consumers may generally be aware of the effects of caffeine, the marketing and advertising for 5-hour ENERGY® products falsely represent and overemphasize the effects of its "beneficial ingredients" other than caffeine while deemphasizing the effect of caffeine.   For example, Defendants claim that   a "powerful blend of B vitamins for energy" including an astounding 8,333% of the recommended dietary allowance of vitamin B-12 and 2,000% of the recommended daily allowance ("RDA") for vitamin B-6,   will let you "sail through your day without feeling jittery or tense."

47.     During the class period, the marketing and advertising claims for 5-hour ENERGY® have included the following representations:

- A powerful blend of B Vitamins for energy.
- 5-hour ENERGY®'s blend of vitamins and amino acids gives you hours of smooth energy.
- 5-hour ENERGY® doesn't jack you up with sugar, caffeine and herbal stimulants. Instead, it's packed with stuff that's good for you – B-vitamins, amino acids and enzymes.
- 5-hour ENERGY® is made from a healthy blend of B-vitamins and amino acids that'll wake you up fast and keep you going strong for hours - with no crash.   5-hour ENERGY® is made without sugar and with very little caffeine - so you get real get up and go that lasts.
- 5-hour ENERGY® drinks provides a boost of energy and mental alertness that lasts for hours – with no crash.   That's because 5-hour ENERGY® is packed with B-Vitamins, enzymes and amino acids. It contains zero sugar, zero net carbs, and just enough caffeine to get the ball rolling.
- The key ingredients in 5-hour ENERGY® are also available in every day foods – like broccoli, avocados, bananas and apples – or already in you. It

contains zero sugar, four calories and as much caffeine as a cup of the leading premium coffee.

48.    For instance, beginning in 2007, Defendants ran a television advertisement on numerous channels across the United States that included the following representations:

"Why do energy drinks make you crash?"



"One minute you are wired up.  The next you feel worse than before.  The answer is large amounts of sugar and caffeine."



1    "That's why you should try a new liquid energy shot called 5-hour Energy.

2    With 5-hour Energy, you can leave grogginess behind and sail through your day

3    without feeling jittery, tense or you know."



13    "***That's because 5-hour Energy contains a powerful blend of B-Vitamins for***

14    ***energy, amino acids for focus and better mood and enzymes to help you feel it***

15    ***faster.***"



49.     Beginning in 2008, Defendants ran another series of television ads on channels across the United States that included football stars Braylon Edwards and Osi Umenyiora and made the following representations:



50.     Also beginning in 2008, Defendants began running commercials on channels across the United States that included race car drivers Steve and Rusty Wallace and made the following representations:



51.    In   2009,   Defendants   maintained   a   section   on   its   website, www.5hourenergy.com, titled "You don't need energy drinks You just need energy." According to the website:

> A typical energy drink comes with a lot of extra baggage  12 teaspoons of sugar, 200 calories, herbal stimulants and 16 ounces of fluid. This combination can make you feel wired up then let you down with a <u>crash</u>. So don't drink energy drinks. Drink a <u>5-Hour Energy shot</u>. It has zero sugar, zero herbal stimulants and as much caffeine as a cup of the leading premium coffee. And best of all  only four little calories.

52.    Similarly, in 2010, Defendant maintained a section on its website, www.5hourenergy.com; which included a segment:   "What's in it?" touting the purported beneficial ingredient contained in 5-Hour ENERGY.   According to the webpage: "Canned energy drinks are full of sugar, caffeine and herbal stimulants. But 5-Hour Energy is packed with stuff that's good for you — B-vitamins, enzymes and amino acids. Zero sugar, zero net carbs and only four calories."

53.    Beginning in 2011, Defendants began running commercials on channels across the United States that included the following representations:

"***Its key ingredients can also be found in every day foods like avocado, broccoli, bananas or already in you***."



"What's going to be your reason for choosing 5-hour Energy?  Its effectiveness?  ***Its beneficial ingredients?***  There's only one way to know.  Try it today."

54.    Beginning in 2012, Defendants began running commercials on channels across the United States that included the following representations:

"How long is that coffee gonna last?  5-hour Energy lasts for hours.  ***It's packed with B-Vitamins and nutrients to make it last***. … 5-hour Energy.  Hours and hours of energy."



55.    During the class period, Plaintiffs saw some or all of these television advertisements.   Plaintiffs repeatedly saw and heard Defendants' clear, common message regarding 5-hour ENERGY®'s supposed "beneficial ingredients" such as "B-Vitamins for energy" and "amino acids" among others described above.  Plaintiffs relied upon those representations and those representations were substantial factors influencing their decision to purchase 5-hour ENERGY®.

56.    In a recent public interview, Defendant Bhargava went so far as to claim that "what [5-hour ENERGY®] has in it is brain nutrients, for brain health. So there is caffeine in it, but the purpose of caffeine is to get everything else absorbed.  Most of the people don't know that one of the great qualities of caffeine is it allows you to

absorb nutrients and it does it quickly, and so when it does it quickly, you focus and when you focus you think you have energy."[6]

57.     Similarly, Dr. Kathy O'Neil-Smith of the Company stated "The amount of caffeine is similar to what's in one premium cup of coffee and the amount of B vitamins are essential for the energy metabolism - and for boosting the furnace of the powerhouse of the cells to provide energy."

58.     Not only do Defendants deemphasize the effects of caffeine, they mask the product's true caffeine content.  For example, the Company discloses that the regular strength variety of 5-hour ENERGY® contains as much caffeine as a cup of premium coffee (four times as much caffeine by volume), while the extra strength variety contains as much as a twelve ounce cup of premium coffee (six times as much caffeine by volume).  The Company, however, has until very recently refused to disclose the actual amount of caffeine in the product.  In fact, an independent chemical analysis revealed that a single two-ounce bottle of regular strength 5-hour ENERGY® contains 207 milligrams of caffeine.

59.     This amount is also approximately seven times the concentration of an average cup of brewed coffee and 19 times the 0.02% FDA limit on caffeine for beverages.[7]

60.     By way of comparison, extra strength caffeine pills, which have been on the market for decades, contain 200 milligrams of caffeine.  They can be purchased for $6.49 for a 100-pill bottle or less than 6.5 cents per pill.

---

[6] A full transcript for the interview is available at http://www.ndtv.com/article/india/full-transcript-in-conversation-with-manoj-bhargava-196198 (last accessed January 2, 2014).

[7] These beverage limitations, however, do not apply to products such as 5-hour ENERGY® as they are marketed as dietary supplements under the 1994 Dietary Supplement Health & Education Act.

61.     Moreover, Defendants have targeted senior citizens with ads featuring celebrity senior John Ratzenberger carrying a bicycle over his shoulder (annexed hereto as Exhibit A), reading:

> **AARP Special MEMBER OFFER**
>
> Getting older is fine, but not having the energy to do the things I enjoy isn't.  That's why I take 5-hour ENERGY®.  It gives me hours of energy to keep on doing the things I love to do.  What do you love to do? Dancing? Golf? Gardening? Whatever it is 5-hour ENERGY® can give you the energy you need.  There's a lot to like about 5-hour ENERGY® Zero sugar. Four calories.  It's a nutritional supplement that really works.  Vitamin B12, vitamin B6, vitamin B3, amino acids and more. Caffeine comparable to a cup of the leading premium coffee.  Also available in Decaf version.

62.     To the extent that the preceding statements claim that ingredients other than caffeine provide consumers with increased energy and focus, those statements are false and deceptive.  To the extent the statements suggest the same, they are calculated to mislead consumers into believing the false premise that consumers who use 5-hour ENERGY® will receive short term benefits from the B-vitamins and amino acids in the product.

### 5-hour ENERGY®'s Claim of "No Crash"

63.     Defendants market 5-hour ENERGY® products as having "No crash later," referring to a type of come-down consumers of energy drinks often feel when the effects of the beverages wear off.

64.     For example, in 2010, Defendant maintained a section on its website, www.5hourenergy.com; which included a segment:  "What Does it Do?" touting the purported beneficial benefits of 5-Hour ENERGY and absence of negative side effects such as "jitters" and "crash."  According to the webpage: "Drink just one little

[5-Hour ENERGY] energy shot, and you can feel awake, alert and productive for hours-without jitters and crash*[8] associated with other energy drinks."  However, *six years ago*, the National Advertising Division ("NAD") urged Defendants to stop making this claim because it is unfounded.  In fact, as discussed below, Defendants' own study showed that "24 percent of those who used 5-Hour Energy suffered a 'moderately severe' crash hours after consuming it."  Barry Meier, *Energy Shot's 'No Crash' Claim Is Disputed by Watchdog*, N.Y. TIMES, Jan. 2, 2013, at B1.

65.    Defendants admit that the "no crash" claim is untrue.  On their website and hidden behind the bottles in the display, tiny print reads: "No crash means no sugar crash."

66.    Any attempt by Defendants to disclaim the representations made in their advertising does not shield Defendants from liability for their untruthful and deceptive claims.  When the average reasonable consumer sees the front of the Product's label he or she is led to believe that the Product will provide five hours of energy now with no crash later.  Reasonable consumers should not be expected to look beyond deceptive representation made on the display and label to discover the truth about a product from an ingredient list set out in small print on the side of the package, or on the Defendant's website. *See Williams v. Gerber Products Co.*, 552 F. 3d 934, 939-40 (9th Cir. 2008).

67.    Thus, Defendants' placement of the words "No crash means no sugar crash" on the back of the Product label, which is in tiny print that is in a font size smaller than every other word on the back of the label, does not shield Defendants from liability. *See id.*  This concerted effort to conceal what Defendants "really

---

[8] According to the website at the time, "crash" or "crash effect" as the term is used in 5-Hour Energy advertising to describe what happens after drinking a canned energy drink refers to a reduction in energy levels below baseline.   Moreover, baseline energy levels are those present immediately before ingestion of an energy drink.

1    meant" when they advertised "no crash" is false and misleading to reasonable

2    consumers.

3         ***Decaffeinated 5-hour ENERGY®***

4         68.    Defendants also market a decaffeinated variety of 5-hour ENERGY®,

5    ("5-hour ENERGY® Decaf") which is touted as providing "hours of alertness and

6    focus without making you feel jittery."

7         69.    The decaffeinated variety of 5-hour ENERGY®, however, includes only

8    a small amount of caffeine, and none of the so-called "beneficial ingredients" provide

9    a feeling of increased energy.

10        70.    5-hour ENERGY® Decaf contains a megadose of B-vitamins and amino

11   acids, but only six milligrams of caffeine, less than one-thirtieth the amount of

12   caffeine in the regular caffeinated variety and according to Defendants, equivalent to

13   half a cup of decaffeinated coffee.

14        71.    Like    the    other    5-hour

15   ENERGY® varieties, Defendants claim

16   these benefits derive from the so-called

17   "beneficial ingredients" in the product.

18   For example, Defendants claim: "Decaf 5-

19   Hour Energy contains B-vitamins for

20   energy and amino acids for focus."



21        72.    The decaffeinated variety of

22   5-hour ENERGY® provides no feeling of

23   increased energy at all.  It is merely a placebo.

24   **The Questionable Claims and Uses of Defendants' "Clinical Studies"**

25        73.    To add the appearance of legitimacy and support to their claims

26   regarding the product's efficacy, Defendants have touted phony clinical studies which

27

28

1   misleadingly present results in a manner that suggests 5-hour ENERGY® products act

2   quickly as something other than a concentrated caffeine shot.

3   ***The Competing Products Study***

4   74.    In response to the NAD's investigation, Living Essentials commissioned

5   a clinical study in 2007 to compare the effects of 5-hour ENERGY® to two

6   competing products (the "Competing Products Study").

7   *The Results Refute Defendants' Advertising Claims*

8   75.    The Company summarized the results of the Competing Products Study

9   in the following chart which is published on its website:



19   76.    There is no set of data that could be both consistent with Defendants'

20   claims about 5-hour ENERGY® and the representations on the chart.  First, the chart

21   indicated that only 60% of 5-hour ENERGY® products provided five or more hours

22   of energy.  Such a low score is inconsistent with the product's name.  Second, the

23   chart also shows that approximately 25% of 5-hour ENERGY® products caused a

24   crash, but in all of its advertisements and on every product bottle, the Company

25   claims that the product provides:  "Hours of energy now- No crash later."

26   77.    Moreover, a report of the so-called clinical trial (which was not

27   published by Defendants) reveals that the chart above falsely reported that subjects

28

using 5-hour ENERGY® experienced a crash after a mean lapse of only 2.43 hours. This result is inconsistent with Defendants' claim that the product does not cause a crash and suggests that most, if not all, subjects experienced a crash.

*The Clinical Study Mill*

78. The Competing Products Study was allegedly conducted by Dr. James Blum. Dr. Blum's company, Marshall-Blum, LLC, purports to be a unique healthcare consulting and research firm, specializing in clinical trials advanced methods of data analysis and outcome-based solutions.

79. Mr. Blum and his company, however, have a long history of churning out improbable or impossible results from purported clinical studies for a myriad of questionable products including: female sexual enhancement products, homeopathic remedies, hair regrowth formulas, and weight loss products. Each of the following products tested by Marshall-Blum were found to be effective:

- Chaser™ – Another product manufactured by Defendants for the prevention of hangovers.

- Avlimil™ - A product found by Dr. Blum to be efficacious for female sexual enhancement. The **same product** is now marketed for the treatment of menopause symptoms rather than sexual enhancement.

- Menastil® – A homeopathic topical remedy for the relief of menstrual cramps. (*See infra* for more information concerning the efficacy of homeopathic treatments).

- Nu Hair™ - "a revolutionary product that fights hair loss and thinning hair with all-natural DHT blockers." Miraculously, more than nine-in-ten (92.3%) of the subjects that completed Dr. Blum's NuHair clinical trial reported hair loss improvement; and

- Vitexxa™ – a revolutionary weight loss accelerator. According to the reported results of this study, 100% of the subjects using Vitexxa lost weight.

*The Phony Medical School*

80.   Innovation Ventures hired an expert to defend the Competing Products Study.  The expert claimed that Dr. Blum was an Epidemiologist and Biostatistician at the University of New England Medical School.  This is false.  The University of New England does not have a medical school.

81.   Innovation Ventures' hired expert further claimed that the University of New England Medical School's Institutional Review Board ("IRB") approved the Competing Products Study.   The Chairman of the University's IRB, however, maintains that his Board never approved such a study.

*The Purported Research Center*

82.   Innovation Ventures' hired expert also claimed that the Competing Products Study was conducted at the Southern Maine Research Center, an independent medical research center, located at 344 Cumberland Street, Westbrook, Maine.  In fact, that is the address of a private proctologist's office.  It is not a medical research facility.   A sign at the address reads in large type:   Maine Proctology Center, Richard Stockwell, D.O. and in smaller type below reads: Southern Maine Research Center.

### ***The Second Study***

83.   The second study which is currently being touted by the Company is promoted in a way that misleads consumers about the ability of the product's ingredients, other than caffeine, to provide a feeling of increased energy.  In this purported clinical study, the Company claims that 5-hour ENERGY® "significantly outperformed placebo on continuity of attention and self-related awareness."  It is not surprising that positive results would be obtained when comparing an inert placebo to the concentrated caffeine shot that is 5-hour ENERGY®.

84.   This study is not subject to review because it is unpublished.   The Company has also refused to provide media and consumer groups with a copy of the study.

85.    The Company has devised a scheme to use the quite predictable results of the placebo study to bolster its misleading claims concerning the immediate energy producing benefits of its ingredients other than caffeine.   The placebo study is presented to consumers on the Company's 5-hour ENERGY® website listing the product's ingredients.[9]   Immediately after touting the results of the placebo study, the Company discusses the relation of its ingredients to energy production and alertness, falsely suggesting that the effects of each of those ingredients contributed to the study's positive results.   Though the high concentration of caffeine is wholly responsible for the results of the placebo study, caffeine is the last of the eleven ingredients described.  The description of the remaining ten ingredients, when taken with the representations above, is designed to mislead consumers into thinking that those ingredients have an immediate noticeable effect on consumers of 5-hour ENERGY®.  The website reads, in part:[10]

> In a clinical trial 5-hour ENERGY® significantly outperformed placebo on continuity of attention and self-related awareness. But what's in it? A brief description of each ingredient follows. …
>
> - Vitamin B6.  … It's involved in over 100 crucial chemical reactions in our bodies.  It helps form nearly all new cells in our bodies.…
> - Vitamin B12 is involved in a variety of important functions including the production of amino acids and the ***processing of carbohydrates into energy***.
> - Niacin is important for energy production. It plays a key role in ***converting fats, proteins, carbohydrates and starches into usable energy***.…

---

[9]    *See* Exhibit. B, 5-hour ENERGY® Ingredients & Safety webpage located at http://www.5hourenergy.com/ingredients.asp (last accessed August 3, 2011).

[10]    *Id.*

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT                    28

- Folic acid, or folate, helps produce and maintain new cells in our bodies…
- Citicoline is a water-soluble compound essential for the synthesis of phosphatidyl choline, a constituent of brain tissue.  Citicoline plays a role in neurotransmission and *can help support brain function*….
- Tyrosine.  An amino acid that *transmits nerve impulses to the brain.*…
- Phenylalanine.  An essential amino acid that *enhances alertness*….
- Taurine … It plays a role in digestion, and is used to process potassium, calcium and sodium in the body, as well as maintain the integrity of cell membranes.
- Malic Acid.  The body synthesizes Malic Acid during the process of *converting carbohydrates to energy*….
- Glucuronolactone.  A natural metabolite found in the human body.  It is produced by the metabolization of glucose in the liver.  *It has been shown to reduce sleepiness*.
- Caffeine.  Provides a boost of energy and feeling of heightened alertness.

(emphasis added).

**Medical Experts Maintain That Defendants' Claims are False and Misleading**

86.    Medical and nutritional experts across the country have challenged Defendants' claims that 5-hour ENERGY® is anything more than a concentrated caffeine shot.

87.    A spokesperson for the product recently told CBS news that "the amount of B-vitamins [in the product] are essential for the energy metabolism and for boosting the furnace or the powerhouse of the cell to provide energy."  But that claim cannot withstand scrutiny.

88.     Dr. Hope Bakoukis, Ph.D., Associate Professor of Nutrition at Case Western Reserve University and Chairwoman of the Sports Cardiovascular and Wellness Nutritionists practice group of the American Dietetic Association has described the Company's claims as "brilliant marketing, but it doesn't have any basis."   She notes that although B-vitamins are responsible for the production of energy, just about everyone in the United States receives all of the B-vitamins that they could possibly need from their diets.  Extra B-vitamins are merely flushed out of the system.  She notes that "[w]eary office workers can't expect to get a jolt from B vitamins in any form."

89.     Dr. Marion Nestle, Ph.D., Professor of Nutrition, Food Studies, and Public Health at New York University, echoed the misleading nature of Defendants' claims by stating:

> It sounds like a great placebo to me.  You can gulp this down and you feel like you're doing something.  And I'll bet you ask people and they say they feel better.  It's got caffeine — why not?

90.     Dr. Victoria J. Drake, Ph.D., Director of the Micronutrient Information Center at the Linus Pauling Institute of Oregon State University stated that "for typical consumers of energy supplements or drinks, B vitamins are nothing more than a gimmick."

91.     Similarly, Dr. Tod Cooperman of consumerlab.com indicated "[e]nergy is not obtained from vitamins or minerals.  The feeling that you might get from this product is from the caffeine."  Furthermore that "[t]he extra vitamins are not going to do anything for you."

92.     Paul R. Thomas, a scientific advisor with the National Institute of Health Office of Dietary Supplements states "these are not going to increase energy levels."

93.     Furthermore, experts working with senior citizen populations have expressed particular outrage with the way the Company markets its product to that vulnerable demographic.

94.     The Company targets seniors in its advertising, and promotional materials. In addition to the Ratzenberger advertisement referenced above, the Company's website offers discounts to members of the American Association of Retired Persons ("AARP").  The webpage includes the following warning for seniors: "Check with your doctor before taking 5-Hour Energy® if you are taking prescription medicines or have a medical condition."  However, Defendant Bhargava and other company staffers handed out thousands of samples of 5-hour Energy® products to seniors at the AARP's annual conference, about which Bhargava's commented: "It was amazing to see the number of people who took it right there and then."

95.     One critic of the Defendants' senior citizen marketing practices is Colin Milner, Chief Executive Officer of the International Council on Active Aging.  He says the key to having more energy as an older adult is to eat right and to exercise, not to down some magic elixir.  Furthermore, energy shots merely "give you a big caffeine rush and away you go."

96.     Similarly, Dr. Evelyn Granieri, Chief of Geriatric Medicine and Aging at Columbia University College of Physicians and Surgeons noted that "[m]edically and physiologically" Defendants' claims don't "hold water."

*The Misleading Doctor Campaign and Attorneys Generals Investigations*

97.     Defendants ran a "safety" advertising campaign through a commercial on television and online for approximately three months ending in October 2012. The advertising campaign was designed to create the illusion that 5-hour Energy® is approved by "73% of Doctors" of 3000 surveyed doctors.

98.     The following are screenshots from the advertisement:

1
2
3
4
5
6
7
8



9          "3,000 doctors reviewed 5-hour Energy®"

10
11
12
13
14
15
16
17



18          (an image of a 5-hour Energy® shot)

19
20
21
22
23
24
25
26

27          "Over 73%"

28

1
2
3
4
5
6
7
8



9    (spokesperson ruffles the giant stack of what appear to be Doctor surveys)

10
11
12
13
14
15
16
17

18    "Over 73%"

19



20
21
22
23
24
25
26
27

28    "4 Calories…Used over 9 million times a week"

Video available at http://www.youtube.com/watch?v=ZSHCbizqIo0 (last accessed January 3, 2014)

99.     While the commercial is running, the spokesperson says:

> We asked over 3,000 doctors to review 5-Hour Energy and what they said is amazing.
> …
> Over 73% who reviewed 5-Hour Energy, said they would recommend a low-calorie energy supplement to their healthy patients who use energy supplements.
> …
> 73%.
> …
> 5-Hour Energy has 4 calories and is used over 9 million times a week.
> …
> Is 5-Hour Energy Right for you? Ask your doctor.

*Id*.

100.   Both the visual and audio aspects of this advertisement are highly misleading.  In no way did any of these doctors, much less 73% of them, generally recommend that consumers take 5-hour Energy® products.  Nor did 73% of these doctors recommend that consumers take 5-hour ENERGY® products over those of a competitor. These doctors essentially answered yes to the following question: if a healthy person consumes energy supplements, would you recommend that this person takes a low calorie alternative?   Answering yes to this question signifies a

recommendation to consume fewer calories, not an endorsement of 5-hour ENERGY®.

101.   This commercial, along with other representations made by Defendants concerning 5-hour ENERGY® products, has prompted investigations by 33 states' attorneys general, the Food and Drug administration, the Department of Justice, and members of Congress.  *See gen.*, Brief of Petitioner at 4-7, *Rosenblum v. Innovation Ventures, LLC*, (Cir. Ct. Or. Dec. 23, 2013), No. 4616842-v3-cjw (discussing the "Doctors Recommended" campaign and FDA, DOJ, and Congressional investigations into 5-hour ENERGY®).

**Alter Ego Allegations**

102.   Bhargava established Living Essentials for an illegal purpose: to perpetrate fraud.  5-hour ENERGY® is Bhargava's and the Company's fourth product to utilize misleading marketing practices as a means of promoting a product with ingredients that do not perform as claimed.  Bhargava and Living Essentials have honed their marketing tactics over time, drawing upon their prior experience of using similarly deceptive marketing tactics in earlier products such as creating phony clinical studies, making false representations in the product name, and attributing the effects of the primary ingredient to lesser ineffective ingredients. Bhargava and Living Essentials then employed this entire arsenal of false marketing and advertising tricks  to sell their most successful product 5-hour ENERGY®.

103.   Defendants abused the corporate form to accomplish fraudulent objects, namely, to fraudulently promote the sale of their products, to conceal the proceeds of those frauds and frustrate the ability of victims to obtain redress for the fraud.

***Living Essentials Was Established and Continues To Operate For a Fraudulent Purpose***

104.   To date, the Company has launched four products: Chaser®, Chaser for Wine Hangovers®, Chaser Plus® and 5-hour ENERGY®.  The Company engaged in

fraud with respect to each of these products.   The fraudulent schemes concerning Chaser® products appear to be dress rehearsals for the main event that is the 5-hour ENERGY® hoax, as each fraudulent scheme bears many similarities to this case.

### *Product 1: Chaser®*

105.   In 2000, Defendant Innovation Ventures, LLC launched its first product, Chaser®, a purported dietary supplement for the treatment of hangovers, and claimed that the product could "help prevent hangovers" and "help prevent hangovers by absorbing elements in beer wine and liquor that cause hangovers."

106.   On March 30, 2001, the FDA wrote to Defendant Bhargava and the Company informing them that their claims for the product do not meet FDA requirements for dietary supplements and determined that the claims suggest that the product be treated as a drug for the treatment of a disease rather than a dietary supplement.[11]   The letter reads in part:

> Your submission states that Living Essentials is making the following claims, among others, for the product Chaser:
>
> "Helps prevent hangovers"
>
> "Helps prevent hangovers by absorbing elements in beer, wine and liquor that cause hangovers"
>
> …   The statements that you are making for this product suggests that it is intended to treat, prevent, mitigate a disease, namely, the consequences of excessive alcohol consumption.   These claims do not meet the requirements of 21 U.S.C. 343(r)(6). These claims suggest that this product is intended for use as a drug within the meaning of 21 U.S.C. 321(g)(l)(B), and that it is subject to regulation under the drug provisions of the act.[12]

107.   Even though classification of Chaser® by the FDA as a drug, rather than a dietary supplement, required Bhargava and the Company to meet rigorous

---

[11]   *See* Exhibit C, FDA letter to Manoj Bhargava, dated March 30, 2001.
[12]   *Id.*

substantiation requirements before continuing their claims concerning Chaser®, Defendants simply ignored this admonishment.  Bhargava thereafter trademarked the prohibited phrase "*Freedom from Hangovers*®," for use in connection with the promotion and sale of the Chaser® products while Defendants continued to sell Chaser® as a dietary supplement, continued to make the prohibited claims, and added the following disclaimer to the product packaging:

> These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease.

But those statements on the product packaging have been evaluated by the FDA and those statements have been rejected by the FDA.



108.   After receiving the FDA's letter, Bhargava and the Company began touting a questionable clinical study as proof of the product's effectiveness (just as they later did with 5-hour ENERGY®) and began asserting even more specific medical claims concerning the effects of the product's active ingredients, calcium carbonate and charcoal (vegetable carbon).  As noted on the Company's website formerly located at *www.doublechaser.com/about_chaser.asp* (last accessed August 3, 2011),[13] Defendants assert:

> Chaser is made of specially processed calcium carbonate and charcoal.  These ingredients attract and absorb hangover-causing toxins and then

---

[13] After this Action was commenced, Defendants removed the Chaser® product website that had been online for more than a decade.

pass them out of your body – like a filter.  In the morning you'll wake up feeling great.

### *Product 2: Chaser® for Wine Headaches*

109.   In or about late 2001, the Company introduced its second product to the market, Chaser® for Wine Headaches, as a purported dietary supplemental, which, like Chaser® listed calcium carbonate and charcoal (vegetable carbon) as its active ingredients.  Chaser® for Wine Headaches made almost identical claims as Chaser®, but this was the first time that the Company included the prohibited claims in the product name (a scheme later repeated in the promotion of 5-hour ENERGY®).

110.   In October 2002, the FDA sent a second letter to Mr. Bhargava informing him that the Company's claims concerning Chaser® for Wine Headaches, including the name of the product itself, also violated FDA regulations prohibiting drug claims in dietary supplements.[14]  The letter reads in part as follows:

> Your submission states that Living Essentials is making the following claims, among others, for the product Chaser for Wine Headaches:
>
> "For wine headaches;"
>
> "To help prevent wine headaches and other discomforts by absorbing harmful elements in wine."
>
> …  The statements that you are making for this product, ***including the use of the term "wine headaches" in its name***, suggest that it is intended to treat or prevent a disease (i.e., adverse consequences, including headaches, associated with alcohol intoxication/poisoning'). These claims do not meet the requirements of 21 U.S.C. 343(r)(6). These claims suggest that this product is intended for use as a drug within the meaning of 21 U.S.C. 321(g)(l)(B), and that it is subject to regulation under the drug provisions of the Act.

(emphasis added).

111.   After receiving this second letter from the FDA, Bhargava and the Company continued to sell Chaser® for Wine Headaches with the prohibited claim in

---

[14]   *See* Exhibit D, FDA Letter to Manoj Bhargava, dated October 30, 2002.

the product's name and continued to claim that the product was: "Specially formulated to help prevent headaches and other discomforts by absorbing harmful elements in wine."  The product packaging also included the disclaimer that those claims had not been evaluated by the FDA.  That disclaimer was false.  The statements **had** been evaluated by the FDA, which rejected the statements and admonished Bhargava and Living Essentials for making them.



### Product 3:  Chaser® Plus

112.  In 2004, Defendants Bhargava and the Company launched their third product, Chaser® Plus, onto the market.  Like the other Chaser® products, the sale of Chaser® Plus is a scam which bears many similarities to the 5-hour ENERGY® hoax.  With Chaser® Plus, Defendants Bhargava and the Company falsely asserted that the effects of certain ingredients in the product are caused by other ingredients, which actually do nothing.  In this instance, however, instead of misattributing the effects of caffeine to the product's B-vitamins and amino acids, Defendants Bhargava and Living Essentials falsely attributed the effects of calcium carbonate and charcoal (vegetable carbon) to homeopathic ingredients[15] in their hangover prevention products.

---

[15]  Homeopathy is a pseudoscience which adheres to the "law of similars" which defies the laws of chemistry and other natural sciences.  *See*  http://en.wikipedia.org/wiki/Homeopathy (last accessed August 3, 2011).  "The practice of homeopathy is based on the belief that disease symptoms can be cured by small doses of substances

113.   Homeopathic drugs do not receive the same level of scrutiny by the FDA that other drugs or even dietary supplements receive.[16]   Defendants' scheme, therefore, served their dual purpose of avoiding FDA scrutiny and claiming to provide a homeopathic alternative to consumers who prefer those products.   But Defendants lied to the FDA and lied to consumers.

114.   Chaser® Plus products still include the same active ingredients as Chaser® products, but Chaser® Plus products list calcium carbonate and carbon as "inactive ingredients" on the label.   Defendants then claimed that the same hangover preventing benefits of Chaser® products provided by calcium carbonite and vegetable carbon are now attributable to the magic of homeopathy in Chaser® Plus products.

115.   Though calcium carbonate and carbon are present in Chaser® Plus, they apparently no longer "attract and absorb hangover-causing toxins."   Rather, the

which produce similar symptoms in healthy people."  FDA, Compliance Policy Guide Manual § 400.400 Conditions Under Which Homeopathic Drugs May be Marketed (CPG7132.15).  Available at www.fda.gov/ora/compliance_ref/cpg/cpgdrg /cpg400-400.html. (last accessed on August 3, 2011) (the "CPG").  According to homeopaths, the more that a substance that causes a particular symptom is diluted, the more potent the substance becomes in curing that same symptom.  *Id.*  For instance, Chaser® Plus purports to contain a 30x concentration of zincum met, which is equal to one part zincum met and 1,000,000,000,000,000,000,000,000,000,000 parts water.  Because zincum met purportedly causes fatigue, headaches and nausea, homeopaths believe that the highly diluted solution of zincum met will cure those symptoms in hangover sufferers.

[16]   *See e.g.*, *Delarosa v. Boiron, Inc.*, No. 10-cv-1569, 2011 U.S. Dist. LEXIS 80562 (C.D. Cal. July 25, 2011) ("Although homeopathic OTC drugs appear to be treated as a subset of OTC drugs by the FDCA and its various regulations, the way in which they are evaluated and tested by the FDA differs markedly from the ways in which non-homeopathic OTC drugs are evaluated.").  *See also*  FDA Warning Letter to Homeopathy for Health, dated June 8, 2010 ("We acknowledge that many homeopathic drug products are manufactured and distributed without FDA approval or authorization under enforcement policies set out in the FDA's Compliance Policy Guide entitled, 'Conditions Under Which Homeopathic Drugs May be Marketed' (CPG 7132.15)").

homeopathic ingredients in Chaser® Plus target the specific symptoms of hangovers. The Chaser® Plus website explained this phenomenon as follows:

> Chaser® Plus is a homeopathic hangover medicine you take while drinking to help you avoid hangovers. Its ingredients target specific hangover symptoms such as headache, nausea, fatigue, dizziness, light and sound sensitivity, and dry mouth. It's a safe alternative to aspirin, acetaminophen and other traditional hangover remedies, many of which carry serious alcohol warnings.

Formerly located at http://www.chaserplus.com/product.asp (last accessed August 3, 2011).[17]



116. The FDA expressly prohibits this scheme of attempting to insulate drug products from scrutiny by disguising them as homeopathic remedies. Specifically, the FDA notes: "Drug products containing homeopathic ingredients in combination with non-homeopathic active ingredients are not homeopathic drug products."[18]

117. Moreover, even though the FDA has told Bhargava and Living Essentials at least twice, that the use of calcium carbonite and charcoal (vegetable carbon) for the treatment of hangovers requires their hangover relief products to pass

---

[17] After this action was commenced, Defendants removed the Chaser® Plus product website that had been online since 2004.

[18] *See* the CPG.

rigorous testing in order to substantiate the claim that Chaser® products can provide "Freedom from Hangovers," Defendants continue to make those claims without such substantiation.

118.   Whatever effect users of Chaser Plus® may experience from the product's true active ingredients, calcium carbonate and carbon, that effect has nothing to do with the purported homeopathic ingredients in the product.

### *Product 4: 5-hour ENERGY®*

119.   Later in 2004, Defendant Bhargava and the Company launched their fourth product, 5-hour ENERGY®.   This time, Defendants employed their entire arsenal of false marketing and advertising tricks to sell the product, including creating phony clinical studies, making false representations in the product name, and attributing the effects of the primary ingredient to lesser ineffective ingredients.

120.   Moreover, the original trademark registration filed by Innovation Ventures for 5-hour ENERGY® listed the product as a homeopathic supplement, just like Chaser Plus®.   But neither product is or has ever been homeopathic.[19]

121.   The Company was created by Defendant Bhargava for the unlawful purpose of perpetrating fraud on consumers and the FDA and has at all times been operated to serve that purpose.

### *Defendant Bhargava Treated Living Essentials as His Own*

122.   Bhargava controls Living Essentials and operates the Company for his personal benefit.   Bhargava owns 100% of Bio Clinical and is Bio Clinical's only employee.   Bhargava uses Bio Clinical to funnel money out of Living Essentials. Living Essentials pays substantial fees to Bio Clinical.   Employees of Living Essentials perform accounting work for Bio Clinical for which they are paid by Living Essentials.

---

[19]   Upon information and belief, Defendants did not ultimately market 5-hour ENERGY to consumers as a homeopathic supplement.

***Defendant Bhargava Has Kept Living Essentials Undercapitalized***

123.   Living Essentials has generated millions of dollars in sales, but that money is immediately taken out of the Company's accounts because Defendant Bhargava has kept the Company undercapitalized in order to make it judgment proof.

124.   Defendant Bhargava told both the Company's former president and its former controller/operations manager that he "wanted to distribute as much cash out of the Company as possible to keep it judgment proof."   Moreover, both of these former executives have said that such distributions to the Company's members were made on a consistent basis.

125.   Defendant Bhargava himself has admitted that the Company's net income for 2007 was $5,000 less than total distributions.   Moreover, in 2008, distributions from the Company exceeded net income.   Meanwhile, in both 2007 and 2008, the Company spent millions of dollars in advertising and brought in millions more from sales of 5-hour ENERGY® products.

126.   The Company is dominated by Defendant Bhargava who has used Living Essentials' corporate form to conceal the profits and income derived from his fraudulent practices.

127.   In light of Defendant Bhargava's domination of Living Essentials, there is such a unity of interest and ownership between him, Living Essentials and Bio Clinical that their separate personalities no longer exist.   Moreover, failure to disregard the corporate entity would sanction fraud and promote injustice in these circumstances, since Defendant Bhargava may abscond with the proceeds of the fraud, after leaving Living Essentials insolvent and unable to satisfy any judgment that may be obtained in this action.

## CLASS ACTION ALLEGATIONS

128.   Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Rule 23 of the *Federal Rules of Civil Procedure*.

129.   Plaintiffs seek to represent a Class defined as all persons in the United States who purchased a 5-hour ENERGY® product.   Excluded from the Class are persons or entities that purchased 5-hour ENERGY® products for resale, Defendants and their subsidiaries and affiliates.

130.   Plaintiffs James, Moussouros, Thompson, Casey, Forrest,  Guarino, Adler and Hermida seek to represent a Class defined as all class members who purchased 5-hour ENERGY® 4, 6, or 12-pack Multi-pack products (the "Multi-pack Subclass").

131.   Plaintiff Nobles seeks to represent a Class defined as all class members who purchased Decaf 5-hour ENERGY® (the "Decaf Subclass").

132.   Plaintiffs Podobedov and Moussouros seek to  represent a subclass defined as all Class members who are New York residents or who purchased 5-hour ENERGY® products within the State of New York (hereafter, the "New York Subclass").

133.   Plaintiffs Podobedov, James, Nunez, Nobles, and Soto further seek to represent a subclass defined as all Class members who are California residents or who purchased 5-hour ENERGY® products within the State of California (hereafter, the "California Subclass").

134.   Plaintiffs Podobedov, James, Nunez, Nobles, and Soto further seek to represent a subclass defined as all California Subclass members who purchased a 5-hour ENERGY® shot for personal, family or household purposes (hereafter the "California Consumer Subclass").

135.   Plaintiffs Thompson and Casey seek to represent a subclass defined as all Class members who are residents of the Commonwealth of Pennsylvania or who purchased a 5-hour ENERGY® shot within the Commonwealth of Pennsylvania (hereafter the "Pennsylvania Subclass").

136.   Plaintiff Guarino seeks to represent a subclass defined as all Class members who are residents of Illinois or who purchased a 5-hour ENERGY® shot within the State of Illinois (hereafter the "Illinois Subclass").

137.   Plaintiff Ellis seeks to represent a subclass defined as all Class members who are residents of New Mexico or who purchased a 5-hour ENERGY® shot within the State of New Mexico (hereafter the "New Mexico Subclass").

138.   Plaintiff Adler seeks to represent a subclass defined as all Class members who are residents of New Jersey or who purchased a 5-hour ENERGY® shot within the State of New Jersey (hereafter the "New Jersey Subclass").

139.   Plaintiff Forrest seeks to represent a subclass defined as all Class members who are residents of Missouri or who purchased a 5-hour ENERGY® shot within the State of Missouri (hereafter the "Missouri Subclass").

140.   Plaintiffs Hermida and Feiner seek to represent a subclass defined as all Class members who are residents of Florida or who purchased 5-hour ENERGY® products within the State of Florida (hereafter the "Florida Subclass").

141.   Members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  While the exact number of Class members is presently unknown, and can only be ascertained through appropriate discovery, Plaintiffs believe the members of the Class exceed hundreds of thousands, if not millions of persons.

142.   Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses.  Among questions of law and fact common to the Class and Subclasses are:

      a.   Whether 5-hour ENERGY® products provide consumers with five hours of energy;

b.  Whether 5-hour ENERGY®'s ingredients, other than caffeine, provide immediate benefits to consumers' energy level, concentration and focus;

c.  Whether Defendants' claim of "No crash later" is false and misleading;

d.  Whether Defendants expressly and/or impliedly warranted that 5-hour ENERGY® would provide consumers with five hours of energy;

e.  Whether Defendants expressly and/or impliedly warranted that 5-hour ENERGY®'s ingredients, other than caffeine, provide immediate benefits to consumers' energy level, concentration and focus;

f.  Whether Defendants breached warranties by making the representations above;

g.  Whether Defendants committed fraud by making the representations and omissions above;

h.  Whether Defendants actions as described above violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*,

i.  Whether Defendants' actions as described above violate the California *Unfair Competition Law*, California *Business & Professions Code* §§ 17200, *et seq.*;

j.  Whether Defendants' actions as described above violate the California *False Advertising Law*, California *Business & Professions Code* §§ 17500, *et seq.*;

k.  Whether Defendants' actions as described above violate the California *Consumers Legal Remedies Act*, California *Civil Code* §§ 1750, *et seq.*;

l.  Whether Defendants' actions as described above violate the New York *General Business Law* §§ 349, *et seq.*;

m. Whether Defendants' actions as described above violate the Pennsylvania *Unfair Trade Practices and Consumer Protection Law*, 73 PA. CONS. STAT. §§ 201-2, *et seq.*;

n. Whether Defendants' actions as described above violate the New Mexico *Unfair Practices Act*, N.M. STAT. ANN. §§ 57-12-2, *et seq*.;

o. Whether Defendants' actions as described above violate the New Jersey *Fraud in Sales or Advertising of Merchandise Law*, N.J. CODE ANN. §§ 56:8-1, *et seq*.;

p. Whether Defendants' actions as described above violate the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J. Stat. Ann. §§ 56:12-14 to 56:12-18;

q. Whether Defendants' actions as described above violate the Missouri *Merchandising Practices Act*, MO. ANN. STAT. §§ 407.020, *et seq*.;

r. Whether Defendants' actions as described above violate the Florida *Deceptive and Unfair Trade Practices Act*, Fla. Stat. §§ 501.201, *et seq*.;

s. Whether Defendants' actions as described above violate the Illinois *Unfair Practices Act*, 805 ILL. COMP. STAT. 505/1, *et seq*.;

t. Whether Defendants should be required to make restitution, disgorge profits, reimburse losses, pay damages and pay treble damages as a result of the above described practices; and

u. Whether the corporate form of Living Essentials should be ignored and liability imposed on Defendants Bhargava and Bio Clinical under an alter ego theory.

143. Plaintiffs' claims are typical of the claims of Class and the Subclasses because Plaintiffs and each member of the Class purchased 5-hour ENERGY®, and suffered a loss of money as a result of that purchase.

144. Plaintiffs are adequate representatives of the Class and the Subclasses because their interests do not conflict with the interests of the Class and Subclass members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The

interests of Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

145.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by the individual members of the Class and Subclasses may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and Subclasses to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action.

**COUNT I**
**<u>VIOLATION OF MAGNUSON-MOSS WARRANTY ACT</u>**
**(15 U.S.C. § 2301, *et seq.*)**

146.   Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

147.   Plaintiffs Moussouros, James, Thompson, Casey, Forrest, Guarino, Adler and Hermida bring this Count I individually and on behalf of the members of the Multi-pack Subclass against all Defendants.

148.   5-hour ENERGY® products are consumer products as defined in 15 U.S.C. § 2301(1).

149.   Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

150.   Plaintiffs Moussouros, James, Thompson, Casey, Adler, Forrest, Guarino and Hermida purchased multi-packs of 5-hour ENERGY® products costing more than $5 and their individual claims are greater than $25 as required by 15 U.S.C. § 2302(e) and 15 U.S.C. § 2310(d)(3)(A).

151.   Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

152.   In connection with the sale of 5-hour ENERGY® products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the products provided 5-hours of energy, B-vitamins for energy and amino acids for focus.

153.   By reason of Defendants' breach of the express written warranties stating that the products provided 5-hours of energy, no crash later, B-vitamins for energy and amino acids for focus, Defendants violated the statutory rights due Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and Class members.

## COUNT II
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Bus. & Prof. Code §§ 17200, *et seq.*)

154.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

155.   This Count II is asserted by Plaintiffs Podobedov, James, Nobles, Nunez, and Soto on behalf of the California Subclass under California law.

156.   Defendants are subject to the Unfair Competition Law ("UCL"), *Business & Professions Code* §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

157.   Defendants violated the "unlawful" prong of the UCL by violating California's *Consumers Legal Remedies Act* ("CLRA") as described in Count IV, below.

158.   Defendants also violated the "unlawful" prong of the UCL by violating California's *False Advertising Law* ("FAL") as described in Count III, below.

159.   Defendants' conduct, described herein, violated the "unfair" prong of the UCL by misrepresenting that 5-hour ENERGY® products would provide the user with five hours of energy and would result in no crash later, by attributing the product's effect to ingredients other than caffeine, and by providing false information about the product's performance in clinical studies.

160.   Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by misrepresenting that 5-hour ENERGY® products would provide the user with five hours of energy and would result in no crash later, by falsely attributing the products effect to ingredients other than caffeine, and by providing false information about the product's performance in clinical studies.

161.   Plaintiffs Podobedov, James, Nobles, Nunez, and Soto and California Subclass members suffered lost money or property as a result of Defendants' UCL violations because:  (a) they would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; and (b) they paid a price premium due to the false representations about the products.

## COUNT III
## FOR VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
**(Bus. & Prof. Code §§ 17500 *et seq.*)**

162.   Plaintiffs and Class members incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

163.   This Count III is asserted by Plaintiffs Podobedov, James, Nobles, Nunez, and Soto on behalf of the California Subclass under California law.

164.   Defendants violated California *Business & Professions Code* § 17500 by publicly disseminating misleading and false advertisements including information suggesting that 5-hour ENERGY® products could provide the user with five hours of energy, the products would result in no crash later, the products' effects could be

1  attributed to ingredients other than caffeine, and by providing false information
2  concerning clinical studies purportedly conducted on those products.

3      165.   Defendants' misleading and false advertisements were disseminated to
4  increase sales of 5-hour ENERGY® products.

5      166.   Defendants knew or should have known their false advertisements were
6  untrue or misleading.

7      167.   Furthermore, Defendants publicly disseminated the false advertisements
8  as part of a plan or scheme and with the intent not to sell 5-hour ENERGY® products
9  as advertised.

10      168.   Plaintiffs Podobedov, James, Nobles, Nunez, and Soto and the members
11  of the California Subclass have suffered harm as a result of these violations of the
12  FAL because: (a) they would not have purchased 5-hour ENERGY® products or
13  would not have purchased 5-hour ENERGY® products on the same terms if the true
14  facts concerning the products had been known; and (b) 5-hour ENERGY® products
15  did not perform as promised.

16      169.   Pursuant to *Business & Professions Code* § 17500, Plaintiffs Podobedov,
17  James, Nobles, Nunez, and Soto seek an order of this Court permanently enjoining
18  Defendants from continuing to publicly disseminate misleading and false
19  advertisements as alleged herein.  Plaintiffs Podobedov, James, Nobles, Nunez, and
20  Soto also seek an order requiring Defendants to: (a) make full restitution for all
21  monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits.

22                          **COUNT IV**
23  **VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
                          **("CLRA")**
24              **(Civil Code §§ 1750, *et seq.*)**

25      170.   Plaintiffs and Class members hereby reallege and incorporate by
26  reference each allegation set forth above as if fully set forth herein and further allege
27  as follows:
28

171.   This Count IV is asserted by Plaintiffs Podobedov, James, Nobles, Nunez, and Soto on behalf of the California Consumer Subclass under California law.

172.   CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Defendants violated this provision by misrepresenting that 5-hour ENERGY® products were of a standard that could provide the user with five hours of energy and would result in no crash later, by falsely attributing the product's effect to ingredients other than caffeine, and by falsely representing the results of clinical testing.

173.   CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Defendants violated this provision by misrepresenting that 5-hour ENERGY® products were of a standard that could provide the user with five hours of energy and would result in no crash later, by falsely attributing the product's effect to ingredients other than caffeine, and by falsely representing the product's performance in clinical testing of the products.

174.   CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendants violated this provision by misrepresenting that 5-hour ENERGY® products could provide the user with five hours of energy and would result in no crash later, by falsely attributing the product's effect to ingredients other than caffeine, and by falsely representing the results of clinical testing of the products.

175.   Plaintiffs Podobedov, James, Nobles, Nunez, and Soto and the California Consumer Subclass members suffered lost money or property as a result of these violations because: (a) they would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms if the true

facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

176.    Prior to the filing of this Complaint, CLRA notice letters were served on Defendants which comply in all respects with California *Civil Code* § 1782(a). Plaintiffs sent Defendants letters *via* certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.    Defendants were further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiffs would amend their Complaint to include a request for monetary damages pursuant to the CLRA.

177.    Wherefore, such time having elapsed, Plaintiffs Podobedov, James, Nobles, Nunez, and Soto seek damages for violations of the CLRA.

## COUNT V
## VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT ("DTPA")
### (New York General Business Law §§ 349, *et seq.*)

178.    Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

179.    Plaintiffs Podobedov and Moussouros assert this Count V on behalf of themselves and the New York Subclass.

180.    Defendants' business practices of marketing, advertising and promoting 5-hour ENERGY® products in a misleading, inaccurate, and deceptive manner by misrepresenting that 5-hour ENERGY® products provide five hours of energy and result in no crash later and by expressly or impliedly attributing the effects of caffeine to the products' other ingredients, constitutes the use by Defendants of unconscionable commercial practices, deception, and misrepresentation and, thus

constitutes multiple, separate violations of the *New York Deceptive Trade Practices Act*, § 349, *General Business Law*, *et seq.*

181.    In marketing, advertising and promoting 5-hour ENERGY® products to consumers, including Plaintiffs Podobedov and Moussouros and members of the New York Subclass, Defendants made the material misrepresentations and omissions set forth in this Complaint throughout the United States, including the State of New York.

182.    Defendants' unlawful conduct set forth in this Complaint is material in that it has the capacity to mislead or deceive consumers, including Plaintiffs and members of the New York Subclass.

183.    Defendants' unconscionable commercial practices, false promises, misrepresentations and omissions set forth in this Complaint are material in that they relate to matters which reasonable persons, including Plaintiffs Podobedov and Moussouros and members of the New York Subclass, would attach importance to in their purchasing decisions or conduct regarding the purchase of 5-hour ENERGY® products.

184.    As a result of Defendants' practices as described herein, Plaintiffs Podobedov and Moussouros and members of the New York Subclass have suffered an ascertainable loss of money or property in that: (a) they would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

**COUNT VI**
**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE**
**PRACTICES ACT**
**("FDUTPA")**
**(FLA. STAT. §§ 501.201, *et seq.*)**

185.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

186.   Plaintiffs Hermida and Feiner assert this Count VI on behalf of themselves and the Florida Subclass.

187.   Defendants violated Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business. "Deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 (Fla. 2003).

188.   FDUTPA is, "a consumer protection law intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." *Tuckish v. Pompano Motor Co.,* 337 F. Supp. 2d 1313, 1319 (S.D. Fla. 2004); FLA. STAT. § 501.202.  In the interests of consumer protection, FDUTPA should be "liberally construed."  *Samuels v. King Motor Co.,* 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

189.   The material misrepresentations and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiffs Hermida and Feiner and the general public, into believing that 5-hour ENERGY® products would provide five hours of energy within minutes, with no negative "crash" effects, when used as directed, and that the product's effect was attributable to ingredients other than caffeine, when, in fact, as set forth in detail

above, they do not provide five hours of energy, they do cause negative "crash" after effects, and any feeling of increased energy or focus can be attributed solely to the product's highly concentrated dose of liquid caffeine.

190.   Defendants' attempt to cure their misleading "no crash" representations, by placing the words "No crash means no sugar crash" in tiny hidden font on the back of 5-hour ENERGY® products does not provide Defendants a shield from liability. Defendants' advertising, on their website and on other media, claims that 5-hour ENERGY® products wear off gradually *because* they contain no sugar.  This is an unfair and deceptive practice because although 5-hour ENERGY® products may contain no sugar, Defendants know that 5-hour ENERGY® products do not wear off gradually and that they cause the same "crash" effects associated with less expensive energy drinks, resulting from the other ingredients and proprietary energy blend contained in 5-hour ENERGY® products.

191.   Additionally, Defendants further seek to differentiate themselves from products such as coffee and soda, thus being able to charge a price premium for 5-hour ENERGY® products, by making claims such as "Coffee and soda help a little, but how long do they last before you're back for more?."  This is a deceptive act and an unfair practice because Defendants know that 5-hour ENERGY® products do not last any longer than alternative energy boosting products, and that 5-hour ENERGY® products cause the same "crash" effects which result in the consumer needing to buy more. Defendants' deceptive and unfair practice is targeted at consumers to make them believe that 5-hour ENERGY® products last longer than alternative energy drinks and that there is no "crash" effect, thus leading consumers to believe that they are paying a price premium because 5-hour ENERGY® products perform better than less expensive alternatives.

192.   The above discussed advertising and labeling of 5-hour ENERGY® products is likely to, and does, mislead reasonable consumers.

193.   Unlike common law fraud, subjective evidence of reliance on the part of each putative Class member is not required under FDUPTA. *See Davis v. Powertel, Inc.,* 776 So. 2d 971, 974 (Fla. 1st DCA 2000); *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 (S.D. Fla. 2010); *State, Office of Atty. Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.,* 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000). Thus, "the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstance." *Davis*, 776 So. 2d at 974; *Urquhart v. Manatee Mem'l Hosp.,* No. 8:06-cv-1418, 2007 WL 781738, at *4 (M.D. Fla. Mar. 13, 2007). Nevertheless, Plaintiffs and Class Members relied on Defendants' statements, believing that 5-hour ENERGY® products would provide five hours of energy within minutes, with no negative "crash" effects, when used as directed, and that the product's effect was attributable to ingredients other than caffeine, when, in fact, as set forth in detail above, they do not provide five hours of energy, they do cause negative "crash" after effects, and any feeling of increased energy or focus can be attributed solely to the product's highly concentrated dose of liquid caffeine.

194.   Had Plaintiffs Hermida and Feiner and the Florida Subclass members known 5-hour ENERGY® products do not perform as advertised, in that they do not provide five hours of energy within minutes, with no negative "crash" effects, and that any feeling of increased energy or focus can be attributed solely to the product's highly concentrated dose of liquid caffeine, they would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms.

195.   As a result of Defendants' deceptive and unfair acts, Plaintiffs Hermida and Feiner and the Florida Subclass members have been damaged in the amount of the purchase price of the 5-hour ENERGY® products or the difference between the

premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that the 5-hour ENERGY® products do not perform as advertised.

196. Defendants' conduct offends established public policy and is substantially injurious to consumers.

197. Plaintiffs Hermida and Feiner and the Florida Subclass members are entitled to damages in an amount to be proven at trial, but not less than either the purchase price of the 5-hour ENERGY® products or the difference between the premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that the 5-hour ENERGY® products do not perform as advertised. The price Plaintiffs Hermida and Feiner and the Florida Subclass members would have paid is no more than the market value of the 5-hour ENERGY® products, had Plaintiffs Hermida and Feiner and the Florida Subclass members known that 5-hour ENERGY® products do not perform as advertised.

198. Defendants should also be ordered to cease their deceptive advertising, and should be made to engage in a corrective advertising campaign, to inform consumers that 5-hour ENERGY® products do not actually provide the energizing effect they claim to have, and that a consumer is likely to experience the same and/or similar "crash" effect associated with a less expensive energy drink.

## COUNT VII
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT "MMPA"
### (MO. ANN. STAT. §§ 407.020, *et seq.*)

199. Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

200. Plaintiff Forrest asserts this Count VII on behalf of himself and the Missouri Subclass.

201.   The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020 (West 2010), provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice … Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

202.   This Count VII is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Defendants.  Defendants' business practices in their advertising, marketing, packaging, labeling and sales of 5-hour ENERGY® products as unique and superior products justifying substantially higher prices over alternative sources of "energy" such as coffee, is an unconscionable, unfair, and deceptive act or practice and constitutes multiple, separate violations of Mo. Ann. Stat. § 407.020.

203.   Defendants engaged in the unlawful practices set forth in this Complaint in the sale of merchandise in trade or commerce.

204.   Plaintiffs and members of the Class purchased 5-hour ENERGY® products primarily for personal, family, or household purposes.

205.   Defendants' concealment, misrepresentations and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff Forrest and members of the Missouri Subclass regarding 5-hour ENERGY® products.

206.   In violation of the MMPA, Defendants employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of 5-hour ENERGY® products in the State of Missouri.

207.   Defendants engaged in the concealment, suppression, misrepresentations and/or omission of the aforementioned material facts with the intent that others, such as Plaintiff Forrest, the Missouri Subclass, and/or the general public would rely upon the concealment, suppression, misrepresentation and/or omission of such material facts and purchase 5-hour ENERGY® products.

208.   The concealment, suppression, misrepresentation and/or omission of the aforementioned material facts had the capacity to, was reasonably foreseeable that it would, and did so deceive a substantial portion.

209.   At all times material hereto, it was reasonably foreseeable that Plaintiff Forrest, and others similarly situated, would rely on the false and fraudulent advertising, marketing, and packaging made by Defendants.  Said reliance has caused Plaintiff Forrest, and others similarly situated, to be damaged.

210.   Plaintiffs and members of the Missouri Subclass would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms absent the concealment, suppression, or omission of the aforementioned material facts.

211.   Plaintiff Forrest, and others similarly situated, has suffered actual and ascertainable loss of money and damages as an actual and proximate result of Defendants' intentional misrepresentations and concealment of material facts.

212.   Defendants' conduct described herein actually and proximately caused Plaintiff Forrest and the Missouri Subclass to suffer damages as described throughout this Complaint.

213.   Plaintiff Forrest and the members of the Missouri Subclass are entitled to recover their actual damages, attorneys' fees, and injunctive or other equitable relief, pursuant to Missouri law, including Mo. Ann. Stat. § 407.025.

214.   Furthermore, Defendants' unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Defendants' actions and for the rights of Plaintiff Forrest and members of the Missouri Subclass and warrants an award of punitive damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

## COUNT VIII
## VIOLATION OF NEW JERSEY FRAUD IN SALES OR ADVERTISING OF MERCHANDISE LAW
### (NEW JERSEY CODE ANN. §§ 56:8-1, *et seq.*)

215.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

216.   Plaintiff Adler asserts this Count VIII on behalf of himself and the New Jersey Subclass.

217.   Defendants, by selling, distributing, designing, packaging and marketing 5-hour ENERGY® products, as set forth above and below engaged in deceptive practices and acts in violation of New Jersey Code Ann. § 56:8-1, *et seq.* ("New Jersey Act").

218.   Namely, Defendants used unconscionable commercial practices, fraud, deception, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, or omission of material facts with the intent that others, including Plaintiff Adler and members of the New Jersey Subclass, rely upon such concealment, suppression or omission, in connection with the sale or advertisement of 5-hour ENERGY® products, which are "merchandise" under the New Jersey Act.

219.   Defendants engaged in unconscionable commercial conduct because their misrepresentations were based on junk science and false interpretation of the results of their own studies.

220.   The sale of 5-hour ENERGY® products in New Jersey to Plaintiff Adler and members of the New Jersey Subclass is an unlawful practice in violation of § 56:8-2 of the New Jersey Act.

221.   Plaintiff Adler and members of the New Jersey Subclass relied on such conduct and were damaged thereby.

222.   As set forth in § 56:8-2.11, Defendants are liable to Plaintiff Adler and members of the New Jersey Subclass for a refund of all monies obtained from them in the purchase of 5-hour ENERGY® products.

223.   As set forth in § 56:8-2.12, Plaintiff Adler and members of the New Jersey Subclass may maintain a private right of action to recover such refunds.

224.   Plaintiff Adler and members of the New Jersey Subclass suffered an ascertainable loss caused by Defendants' misrepresentations because: (a) they would not have purchased 5-hour ENERGY® products or would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

225.   Defendants' dissemination of these misrepresentations in order to sell more of its product were actuated by actual malice and/or accompanied by a wanton and willful disregard of harm to Plaintiff Adler and members of the New Jersey Subclass.

226.   As set forth in § 56:8-19, Plaintiff Adler and members of the New Jersey Subclass may bring this action and this Court "shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest . . . [and] the court shall also award reasonable attorneys' fees,

filing fees, and reasonable costs of suit."  Plaintiff Adler and New Jersey Subclass members seek this relief.

### COUNT IX
### VIOLATIONS OF THE NEW JERSEY TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT "TCCWNA"
### (NEW JERSEY STAT. §§ 56:12-14 to 56:12-18)

227.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

228.   Plaintiff Adler asserts this Count IX on behalf of himself and the New Jersey Subclass.

229.   The TCCWNA provides:

> No seller…shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign …which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

230.   The labels and marketing materials for 5-hour ENERGY® products are written consumer warranties, notices and/or signs offered, given and/or displayed to consumers and prospective consumers subject to the TCCWNA.

231.   Plaintiffs and class members are "consumer[s] or prospective consumer[s]" within the meaning of N.J.S.A. § 56:12-15.

232.   Each of the Defendants is a "seller" within the meaning of N.J.S.A. § 56:12-15.

233.   The rights of consumers to truthful and accurate statements on the labels and marketing materials for 5-hour ENERGY® products, as well as the right to avoid

deception caused by false and misleading statements on such labels and marketing materials, are "clearly established legal rights" under N.J.S.A. § 56:8-2.

234.   The responsibility of a seller to refrain from the employment of any unconscionable commercial practice, deception, fraud, false pretense, or misrepresentation, and to refrain from the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of merchandise, and to refrain from selling products with labels that make false statements about the products, are clearly established under N.J.S.A. § 56:8-2.

235.   The Defendants violated the TCCWNA by misrepresenting that 5-hour ENERGY® products would provide the user with five hours of energy and would result in no crash later, by falsely attributing the product's effect to ingredients other than caffeine, and by falsely representing the results of clinical testing and studies.

236.   Pursuant to N.J.S.A. § 56:12-17, Defendants are liable to Plaintiff Adler and the New Jersey Subclass for a civil penalty of not less than $ 100.00 or for actual damages, or both at the election of the consumer.  In addition, Plaintiffs are entitled to reimbursement for all reasonable attorney's fees and court costs incurred as a result of bringing this action.

**COUNT X**
**VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT**
**"NMUPA"**
**(N.M. STAT. ANN. §§ 57-12-2, *et. seq.*)**

237.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

238.   Plaintiff Ellis asserts this Count X on behalf of himself and the New Mexico Subclass.

239.   NMUPA prohibits a corporation from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that the person does not have."  N.M. STAT. ANN. § 57-12-2(D)(5). The Act also prohibits a company from "[r]epresenting that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model, if they are of another." *Id*. at § 57-12-2(D)(7).

240.   At all relevant times, Defendants, in connection with their advertisements, offers for sale, sales and distribution of the 5-hour ENERGY® products, knowingly and purposefully misrepresented, concealed, omitted, and/or suppressed the material fact that the Products would provide five hours of energy, with no crash later, and an immediate increase in energy, alertness and focus as a result of ingredients other than caffeine.  Defendants intended that Plaintiff Ellis and the members of the New Mexico Subclass would rely upon Defendants' misrepresentations, concealments, omissions and/or suppressions so that Plaintiff Ellis and the members of the New Mexico Subclass would purchase 5-hour ENERGY® products.  Defendants' packaging of 5-hour ENERGY® products makes false or misleading representations that 5-hour ENERGY® products provide five hours of energy and do not have a crash effect which tended to deceive, or deceived or misled, the consumers.  In truth, the Products do not provide five hours of energy and a crash does occur with use of 5-hour ENERGY® products.

241.   The material misrepresentations and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiffs and the general public, particularly working adults, into believing that 5-hour ENERGY® products would provide five hours of energy within minutes with no negative crash effects when in fact they do not provide five hours of energy and do cause a crash as Defendants well knew.

242.   Had Plaintiff Ellis and members of the New Mexico Subclass known that 5-hour ENERGY® products do not perform as advertised, in that they do not provide five hours of energy within minutes with no crash, they would not have purchased 5-hour ENERGY® products.

243.   As a result of Defendants' deceptive and unfair acts, Plaintiff Ellis and members of the New Mexico Subclass have been damaged in either the purchase price they paid for 5-hour ENERGY® products or the amount of the difference between the premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that 5-hour ENERGY® products were not fit when consumed in that they had such effects.

244.   Plaintiff Ellis and members of the New Mexico Subclass are entitled to damages in an amount to be proven at trial, but not less than the difference between the premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that 5-hour ENERGY® products do not provide five hours of energy without a crash.

245.   Defendants' actions were malicious, willful, reckless, wanton, fraudulent, or in bad faith.

246.   Defendants should also be ordered to cease their deceptive advertising, and should be made to engage in a corrective advertising campaign, to inform consumers that 5-hour ENERGY® products do not actually provide the energizing effect they claim to have, and that a consumer is likely to experience the same and/or similar "crash" effects associated with less expensive energy drinks.

**COUNT XI**
**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW**
**("UTPCPL")**
(73 Pa. Cons. Stat. §§ 201-2, *et seq.*)

247.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

248.   Plaintiffs Thompson and Casey assert this Count XI on behalf of themselves and the Pennsylvania Subclass.

249.   Defendants are "persons" pursuant to the terms of Section 201-2(2) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

250.   The packaging, labeling and display possessed by the Plaintiffs Thompson and Casey, and members of the Pennsylvania Subclass, constitute "documentary material" pursuant to the terms of Section 201-2(1) of the UTPCPL.

251.   Each of the 5-hour ENERGY® products that were ultimately possessed by Plaintiffs Thompson and Casey, and members of the Pennsylvania Subclass, was purchased primarily for personal purposes.

252.   Defendants' action of injecting 5-hour ENERGY® products into the stream of commerce with the intent that they be bought and sold within Pennsylvania which as a result was ultimately possessed by the Plaintiffs Thompson and Casey, and members of the Pennsylvania Subclass, constitutes "trade" or "commerce" as defined by Section 201-2(3) of the UTPCPL.

253.   Defendants violated express and implied warranties in the labeling and displaying of 5-hour ENERGY® products that were ultimately possessed by Plaintiffs Thompson and Casey and members of the Pennsylvania Subclass.

254.   The aforesaid actions of Defendants constitute "unfair methods of competition" and "unfair or deceptive acts of practices" pursuant to the following

provisions of the UTPCPL: Section 201-2(4)(v), Section 201-2(4)(vii), and Section 2012(4)(xxi).

255.   The aforesaid actions of Defendants referenced above constitute unlawful actions proscribed by Section 201-3 of the UTPCPL.

256.   As a direct and proximate cause of the aforementioned unlawful actions of Defendants, Plaintiffs Thompson and Casey, and members of the Pennsylvania Subclass, have suffered economic loss.

257.   Pursuant to Section 201-9.2 of the Consumer Protection Law, Plaintiffs Thompson and Casey, and members of the Pennsylvania Subclass, are entitled to a judgment in an amount up to three times the actual damages sustained, but not less than One Hundred Dollars ($100.00), and the Court may provide such additional relief as it deems necessary and proper, including punitive damages.

258.   In addition, Plaintiffs are entitled to reimbursement for all reasonable attorney's fees and costs incurred as a result of bringing this action pursuant to Section 201-9.2 of the UTPCPL.

## COUNT XII
## <u>VIOLATION OF ILLINOIS UNFAIR PRACTICES ACT</u>
### (805 ILL. COMP. STAT. 505/1, *et seq.*)

259.   Plaintiffs and Class members hereby reallege and incorporate by reference each allegation set forth above as if fully set forth herein and further allege as follows:

260.   Plaintiff Guarino asserts this Count XII on behalf of himself and the Illinois Subclass.

261.   The Illinois Unfair Practices Act, 805 Ill. Comp. Stat. 505/2, *et seq.*, prohibits a corporation from engaging in unfair or deceptive trade practices.  The Act provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception

fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act,", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

262.  At all relevant times, 5-hour ENERGY® products have been available for purchase by consumers through the State of Illinois.

263.  At all relevant times, Defendants have been engage in advertising, offering for sale, selling and/or distributing 5-hour ENERGY® products directly or indirectly to the residents of the State of Illinois.

264.  Plaintiff Guarino and members of the Illinois Subclass have purchased 5-hour ENERGY® products for their own personal and/or household use.

265.  At all relevant times, Defendants, in connection with their advertisements, offers for sale, sales and distribution of 5-hour ENERGY® products, knowingly and purposefully misrepresented, concealed, omitted, and/or suppressed the material fact that the Products would provide five hours of energy, with no crash later, and an immediate increase in energy, alertness and focus as a result of ingredients other than caffeine.  Defendants intended that Plaintiff Guarino and members of the Illinois Subclass would rely upon their misrepresentations, concealments, omissions and/or suppressions so that Plaintiff Guarino and members of the Illinois Subclass would purchase 5-hour ENERGY® products.  Defendants' packaging of 5-hour ENERGY® products makes false or misleading representations that the Products provide five hours of energy and do not have a "crash" effect which tended to deceive, or deceived or misled, the consumers.  In truth, the Products do not provide five hours of energy and a "crash" does occur with use of the Products.

266.   The material misrepresentations and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiffs and the general public, particularly working adults, into believing that 5-hour ENERGY® products would provide five hours of energy within minutes, with no negative "crash" effects, when used as directed, when, in fact, as set forth in detail above, they do not provide five hours of energy and cause negative "crash" after effects.

267.   Had Plaintiff Guarino and Illinois Subclass members known 5-hour ENERGY® products did not perform as advertised, in that they do not provide five hours of energy within minutes, with no negative "crash" effect, they would not have purchased the Products.

268.   As a result of Defendants' deceptive and unfair acts, Plaintiff Guarino and Illinois Subclass members have been damaged in the amount of either the purchase price they paid for 5-hour ENERGY® products or the difference between the premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that the Products were not fit when consumed in that they do not perform as advertised.

269.   Defendants' conduct offends established public policy, and is substantially injurious to consumers.

270.   Plaintiff Guarino and Illinois Subclass members are entitled to damages in an amount to be proven at trial, but not less than either the purchase price they paid for 5-hour ENERGY® products or the difference between the premium price paid for 5-hour ENERGY® products and the price they would have paid had they known that the Products do not provide five hours of energy and that they cause a negative "crash" after effect.

271.   Defendants should also be ordered to cease their deceptive advertising, and should be made to engage in a corrective advertising campaign, to inform

consumers that 5-hour ENERGY® products do not actually provide the energizing effect they claim to have, and that a consumer is likely to experience the same and/or similar "crash" effects associated with less expensive energy drinks.

272.  Plaintiff Guarino and other consumers relied on the false or misleading packaging to their detriment.

273.  As a result, Plaintiff Guarino and Illinois Subclass members have been injured by Defendants' unlawful conduct.

## COUNT XIII
## BREACH OF EXPRESS WARRANTY

274.  Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

275.  Plaintiffs James, Podobedov, Moussouros, Nobles, Nunez, Soto, Adler, Thompson and Casey bring this Count XIII individually and on behalf of the members of the Class residing in California, New Jersey, New York, Pennsylvania against all Defendants.

276.  Defendants expressly warranted in their marketing, advertising and promotion of 5-hour ENERGY® products that those products could provide five hours of energy, with no crash later, and an immediate increase in energy, alertness and focus as a result of ingredients other than caffeine.

277.  Plaintiffs James, Podobedov, Moussouros, Nobles, Nunez, Soto, Adler, Thompson and Casey and members of the Class residing in California, New Jersey, New York, Pennsylvania   purchased 5-hour ENERGY® products based upon the above said express warranty.

278.  Defendants breached their express warranty by selling a product that is not capable of providing five hours of energy or an immediate increase in energy, alertness and focus from ingredients other than caffeine, and does have negative "crash" effects.

279.   As a direct and proximate result of Defendants' breaches of their express warranty, Plaintiffs James, Podobedov, Moussouros, Nobles, Nunez, Soto, Adler, Thompson and Casey and members of the Class residing in California, New Jersey, New York, Pennsylvania have been damaged in that they did not receive the product as specifically warranted and/or paid a premium for the product based on the Defendants' misrepresentations.

280.   Plaintiffs Podobedov and Moussouros satisfied New York's notice requirement by filing their complaint on August 4, 2011 in this Court.   *See Panda Capital Corp. v. Kopo Intern., Inc.*, 662 N.Y.S.2d 584, 586-87 (N.Y. App. Div. 1997); *see also Fischer v. Mead Johnson Lab.*, 341 N.Y.S.2d 257 (N.Y. App. Div. 1973) (no notice requirement for products sold for human consumption).

281.   Plaintiffs Casey and Thompson satisfied Pennsylvania's notice requirement by filing their complaint on or about March 7, 2013 in the United States District Court for the Western District of Pennsylvania.   *See Bednarski v. Hideout Homes & Realty, Inc.*, 709 F.Supp. 90, 93 (M.D. Pa. 1988).

282.   Plaintiff Adler satisfied New Jersey's notice requirement by filing his complaint on or about March 1, 2013 in the United States District Court for the District of New Jersey.   *See Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912 at *3 (D.N.J. 2005).

**COUNT XIV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

283.   Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

284.   Plaintiffs James, Soto, Nobles, Nunez, Casey, Thompson, Feiner, Hermida, Adler, and Ellis bring this Count XIV individually and on behalf of the members of the Class residing in California, Pennsylvania, Florida, New Jersey and New Mexico against all Defendants.

285.   Defendants impliedly warranted that the 5-hour ENERGY® products they manufactured, sold and distributed could provide five hours of energy, with no crash later, and an immediate increase in energy, alertness and focus as a result of ingredients other than caffeine and that the products were merchantable and fit for their intended purpose.  Defendants did so with the intent to induce Plaintiffs James, Soto, Nobles, Nunez, Casey, Thompson, Feiner, Hermida, Adler, and Ellis and members of the Class residing in California, Pennsylvania, Florida, New Jersey and New Mexico to purchase those products.

286.   Defendants breached their implied warranties in that the products cannot provide five hours of energy, they do have negative "crash" effects, and the ingredients other than caffeine do not provide an immediate increase in energy, alertness and focus as marketed, advertised and promoted and is therefore not fit for ordinary use and the ordinary purpose for which it is used.

287.   Had Plaintiffs James, Soto, Nobles, Nunez, Casey, Thompson, Feiner, Hermida, Adler, and Ellis and the members of the Class residing in California, Pennsylvania, Florida, New Jersey and New Mexico known the true facts, they either would not have purchased the products or would not have been willing to pay the premium price Defendants charged for the products.

288.   Plaintiffs Casey and Thompson satisfied Pennsylvania's notice requirement by filing their complaint on or about March 7, 2013 in the United States District Court for the Western District of Pennsylvania.  *See Bednarski v. Hideout Homes & Realty, Inc.*, 709 F.Supp. 90, 93 (M.D. Pa. 1988).

289.   Plaintiff Adler satisfied New Jersey's notice requirement by filing his complaint on or about March 1, 2013 in the United States District Court for the District of New Jersey.  *See Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912 at *3 (D.N.J. 2005).

**COUNT XV**
**FRAUD – INTENTIONAL MISREPRESENTATION AND CONCEALMENT OF FACT**

290. Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

291. Plaintiffs bring this Count XV individually and on behalf of the members of the nationwide Class against all Defendants.

292. Defendants intentionally, willfully, falsely, and knowingly uniformly misrepresented material facts in writing that relate to the character and quality of 5-hour ENERGY® products. Specifically, Defendants intentionally and willfully misrepresented that 5-hour ENERGY® products provide benefits to consumers in addition to that of a caffeine tablet or cup of coffee, and failed to disclose that they pose health risks on websites, in various media advertising, and at point of sale materials disseminated or caused to be disseminated by Defendants.

293. Defendants also made intentional misrepresentations to putative class members who sought to have Defendants honor their warranty. Defendants represented to putative class members by affirmative misrepresentations and omissions that 5-hour ENERGY® products provide benefits over and above what could be achieve by a caffeine tablet or standard cup of coffee even though they have no competent, credible, and reliable scientific evidence that is sufficient in quality and quantity, based on standards generally acceptable in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate their claims regarding the superior effectiveness of 5-hour ENERGY® products.

294. Defendants' uniform written misrepresentations were made with the intent that the general public, including Plaintiffs and the putative Class, would rely upon them. Defendants' representations were made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof, and gave Defendants an

unjust advantage and caused a loss to Plaintiffs and putative class members. Defendants' claims of superior effectiveness are so central to the consumer's selection of 5-hour ENERGY® products that Defendants knew and intended that consumers would rely on those misrepresentations in determining whether to purchase 5-hour ENERGY® products instead of the less expensive alternatives.

295.   In actual and reasonable reliance upon Defendants' misrepresentations, Plaintiffs and putative class members purchased 5-hour ENERGY® products for their intended and reasonably foreseeable purposes. Plaintiffs and putative class members were unaware of the true facts concerning the effectiveness and health risks of 5-hour ENERGY® products, which were concealed from Plaintiffs and the putative class members.  If Plaintiffs and putative class members had been aware of the concealed facts, Plaintiffs and the putative class members would not have purchased 5-hour ENERGY® products at all or for the premium price paid.  Plaintiffs' and putative class members' reliance on the representations of the Defendants was reasonable.

296.   Defendants misrepresented material facts with the intent to defraud Plaintiffs and the putative class members. Plaintiffs and the putative class members were unaware of the intent of Defendants and relied upon these representations in agreeing to purchase 5-hour ENERGY® products.

297.   In actual and reasonable reliance upon Defendants' misrepresentations, Plaintiffs and putative class members purchased 5-hour ENERGY® products and did not benefit from 5-hour ENERGY® products as represented, the direct and proximate result of which was injury and harm to Plaintiffs and putative class members because:

a.  they would not have purchased 5-hour ENERGY® products if the true facts concerning their effectiveness had been known;

b.  they paid a price premium due to the mislabeling of 5-hour ENERGY® products; and

1       c. 5-hour ENERGY® products did not (and cannot) perform as

2       promised.

3  **PRAYER FOR RELIEF**

4  Plaintiffs, on their own behalf and on behalf of the Class, pray for the

5  following relief:

6  A. For an order certifying the nationwide Class, the Multi-pack Subclass,

7  the State Subclasses under Rule 23 of the *Federal Rules of Civil Procedure* and

8  naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to

9  represent the Class members;

10  B. For an order finding in favor of Plaintiffs, the Class, and all Subclasses

11  on all counts asserted herein;

12  C. For an order awarding compensatory, treble, and punitive damages in

13  amounts to be determined by the Court and/or jury;

14  D. For prejudgment interest on all amounts awarded;

15  E. For an order of restitution and all other forms of equitable monetary

16  relief; and

17  F. For an order awarding Plaintiffs and the Class their reasonable attorneys'

18  fees and expenses and costs of suit.

19  **JURY DEMAND**

20  Plaintiffs demand trial by jury on all issues herein stated.

21  Dated:  October 6, 2014        **BURSOR & FISHER, P.A.**

22  By:  */s/ L. Timothy Fisher*

23

24  L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)

25  1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596

26  Telephone:  (925) 300-4455
Facsimile:   (925) 407-2700

27  E-Mail:  ltfisher@bursor.com
          apersinger@bursor.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, New York 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail:   scott@bursor.com

**FARUQI & FARUQI, LLP**

By:   */s/David E. Bower*

David E. Bower (State Bar No. 119546)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA  90024
Telephone:   (424) 256-2884
Facsimile:     (424) 256-4885
E-Mail:   dbower@faruqilaw.com

**FARUQI & FARUQI, LLP**
Antonio Vozzolo (*pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone:   (212) 983-9330
Facsimile:     (212) 983-9331
E-Mail:   avozzolo@faruqilaw.com
              aclisura@faruqilaw.com

**GERAGOS AND GERAGOS APC**

By:   */s/ Mark John Geragos*

Mark John Geragos (State Bar No. 108325)
Benjamin Jared Meiselas (State Bar No. 277412)
644 South Figueroa Street
Los Angeles, CA  90017
Telephone:  (213) 625-1600
E-Mail:  mark@geragos.com
              kaufman@geragos.com
              meiselas@geragos.com

*Co-Lead Interim Class Counsel*